In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00419-CV**

**SCHINDLER ELEVATOR CORPORATION, Appellant**

**V.**

**DARREN CEASAR, Appellee**

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-200,813

**MEMORANDUM OPINION**

Appellee Darren Ceasar ("Ceasar," "Plaintiff," or "Appellee") filed a personal injury lawsuit against Appellant Schindler Elevator Corporation ("Schindler," "Defendant," or "Appellant") and 904 Hotel Operating LLC d/b/a MCM Elegante Hotel ("the Elegante") for damages for injuries he alleged he received while riding in an elevator in the Elegante. Before trial, the court granted summary judgment for

the Elegante.[1] A jury returned a verdict for Ceasar and awarded $841,754.82 in damages. The trial court denied Schindler's motion for new trial, entered a final judgment on the verdict, and imposed $25,000 in sanctions against Schindler for pretrial discovery abuse. In seven issues, Appellant challenges the exclusion of certain evidence, the jury charge, document production required by the court during trial, sanctions, and the denial of Schindler's motion for mistrial. We affirm.

Ceasar's Petition

Ceasar filed his Original Petition against the Elegante and Schindler on October 12, 2017, and he filed an amended petition on October 15, 2018. Ceasar alleged he was injured while riding an elevator at the Elegante. According to the petition, the elevator failed to stop at the seventh floor, "slammed into the top of the elevator shaft[,]" and became stuck. According to the petition, the panic button in the elevator failed to work, and Ceasar called 911 from his cell phone. After about half an hour, the fire department arrived and helped Ceasar out of the elevator. The petition alleged that Ceasar suffered injuries to his neck and back as well as mental

---

[1] In an earlier appellate case, Ceasar and 904 Hotel Operating LLC d/b/a MCM Elegante Hotel (the Elegante), were parties to an appeal and before this court issued a decision the parties filed a joint motion to dismiss the appeal, which we granted. *See Ceasar v. 904 Hotel Operating LLC*, No. 09-19-00102-CV, 2021 Tex. App. LEXIS 2022 (Tex. App.—Beaumont Mar. 18, 2021, no pet.) (mem. op.). The Elegante is not a party to this appeal.

pain and anguish from the incident, that his ability to work was "substantially reduced[,]" and he had needed "continuous medical treatment."

Ceasar brought claims for negligence and gross negligence against the Elegante and against Schindler, the company that executed a contract with Elegante to maintain, repair, and inspect the elevators. According to the petition, the defendants had actual knowledge of the defective and dangerous nature of the Elegante elevators because another hotel guest was injured on October 10, 2014, when an elevator fell several floors. Ceasar also brought a premises liability claim against the Elegante. The petition alleged that *res ipsa loquitur*[2] applied to both defendants. Ceasar sought compensatory and punitive damages.

---

[2] *Res ipsa loquitur* is Latin for "the thing speaks for itself." *Res Ipsa Loquitur*, Black's Law Dictionary (9th ed. 2009). It is not a separate cause of action, but generally it allows a plaintiff to be relieved from proving a specific act of negligence by the defendant when it is impossible for the plaintiff to determine the sequence of events, or when the defendant has superior knowledge or means to determine the cause of the accident. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 865 (Tex. 1982). The Texas Pattern Jury Charge includes an instruction on *res ipsa loquitur* and it states as follows:

> In answering this question, you may infer negligence by a party but are not compelled to do so if you find that (1) the character of the occurrence is such that it would ordinarily not happen in the absence of negligence and (2) the instrumentality causing the occurrence was under the management and control of the party at the time that the negligence, if any, probably occurred.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 51.8 (2018).

Testimony of the Plaintiff

Darren Ceasar testified that he is forty-three years old, and he works as a barber in Eunice, Louisiana. Ceasar testified that he went to the Elegante Hotel for a vacation. According to Ceasar, after he checked in at the Elegante, he went up to his room on the seventh floor without his bags to see what the room looked like. Then he went back downstairs and spoke to a lady in the bar, then he left the hotel to get a pizza, and returned with the pizza and got back into an elevator carrying a pizza and his bag to go back to his room. According to Ceasar, as the elevator approached the seventh floor, it started speeding, it went past the seventh floor, the elevator started shaking with a vibration, he heard metal grinding, and the elevator came to an abrupt stop. Ceasar recalled that, due to the impact of the stop, he dropped the pizza and his bag, and the stop "jarred [his] body." Ceasar testified that he pressed buttons in the elevator to open the door and to sound the elevator alarm, but the alarm got quieter. Ceasar was nervous about being stuck in the elevator and he started panicking and worrying that the elevator was going to fall.

After about three to five minutes, he used his cell phone to call 911. Ceasar testified that when the firefighters arrived, they told him to "[h]old on[,]" and then they opened the door and got him out. Ceasar recalled that he felt "discombobulated[,]" he had to take a step down to get off the elevator, and he "just

want[ed] to get away from there.…away from the elevator." Ceasar testified that after he got out of the elevator, he took the stairs down because he did not want to deal with any elevators, and afterwards the hotel moved him to a room on the main level. Ceasar testified that he went to the new room, and he decided to rest a little while, and that is when he started feeling pain. Ceasar eventually checked out of the hotel and left to find a hospital. Ceasar explained that he was not familiar with the Beaumont area, and when he did a Google search for hospitals, he found one in Port Arthur, where they treated him, and he received a prescription. Ceasar agreed that before the elevator incident, he had previously had a sore neck and back, and he testified that he told people at the hospital that he had previously had pain in his neck and back.

Ceasar testified that he told Dr. Brennan, the doctor who did surgery on his back after the elevator accident, about his prior neck and back pain. According to Ceasar, although he had neck and back pain before the elevator incident, his neck and back pain got worse after the elevator incident. Ceasar testified that the surgery Dr. Brennan performed helped his back a little, but his neck still hurts.

Ceasar testified that he made a Facebook Live video while he was waiting in the elevator to let people know where he was, and in the video, he was screaming for help, kicking and knocking on the door, and saying "[h]elp me." According to Ceasar, the following day, people were commenting on the video, and he did not like

5

the way it made him feel because it was like "reliving the moment [] again[,]" and he deleted the video. Ceasar testified that he wished he had the video to show the jury.

On cross-examination, Ceasar testified that at first, the hotel elevator moved normally, but it stopped abruptly on the ninth floor, and he heard a boom and clacking as though the elevator was vibrating. Ceasar recalled that the force of the abrupt stop caused his pizza and bag to fall to the floor of the elevator. According to Ceasar, the abrupt stop caused him to have pain in his neck and back. Ceasar said he does not think he fell but he really did not remember. Ceasar testified that he pressed buttons to try to get out, and initially the panic button made a sound, but ultimately the sound stopped. Ceasar denied that he thought about suing before he deleted the Facebook Live video.

According to Ceasar, he told the woman working at the front desk that he got stuck in the elevator and she laughed at him and said, "Steve [is] going to be mad. They just worked on those elevators." Ceasar recalled that another customer walked up and said, "I hear someone got caught in the elevator[,]" and the desk clerk pointed at him and smirked. Ceasar testified that right after the accident he called his sisters, and he also spoke with his brother-in-law, who is an attorney. According to Ceasar, when things calmed down and he went to his room, he started feeling the pain increase.

Ceasar recalled that someone told him he needed to speak to the general manager who was at the bar, he told her about the incident and that he was injured, and she said she would like to make a report. Ceasar's handwritten report to the Elegante was admitted as Defense Exhibit 10.

According to Ceasar, someone in the hotel told him there was a hospital nearby, but after driving about fifteen minutes, he could not find it, so he stopped the car and Googled "hospital[]" and he went to the first hospital in the search results. Ceasar testified that he walked into the hospital in Port Arthur, told them what happened, and he received an X-ray and medication. Defense counsel asked Ceasar about the hospital report statements that he "walked in without difficulty or limping[]" and "appears in no apparent distress[,]" and Ceasar replied that the woman he spoke with was rude to him and perhaps did not see his emotions and he told her his pain was at level 10. Ceasar also testified that he told people at the Port Arthur hospital that he had previously had back problems and a herniated disc.

Ceasar recalled that prior to the elevator incident, he had seen Dr. Metoyer in Louisiana for back pain, and records were admitted into evidence that reflect dates of service for Ceasar in 2014, 2015, and 2016, all prior to the elevator incident. The records reflect Ceasar had previously complained of neck and low back pain, tenderness, stiffness, limited range of motion, headaches, numbness and tingling in his legs. Ceasar agreed that he also saw Dr. Metoyer for back pain in 2013, where

an MRI revealed a lumbar herniated disc, that he sought treatment for back pain at Opelousas General Hospital in 2016, and that he sought treatment for back pain at University Hospital in Lafayette in 2016.

<u>Testimony of Plaintiff's Elevator Expert, John Freeman</u>

John Freeman testified that he has worked in the elevator business for thirty-eight years, most recently in consulting and inspections, and he is a certified elevator inspector. Freeman agreed that when preparing his opinions in this case, he reviewed the deposition testimony of Michael Prudhomme. Freeman testified that the elevator involved in the incident was Elegante Elevator No. 2.

According to Freeman, on August 13, 2017, the elevator was not functioning properly, and it is not normal for a properly functioning elevator to go to the wrong floor or beyond the top of the highest floor. Freeman agreed that it is typical for property owners to rely on an elevator company for elevator maintenance. Freeman testified that the maintenance and repair contract between the Elegante and Schindler covered four elevators—two passenger elevators, one service elevator, and one hydraulic passenger elevator—for a fee of $1600 per month. Freeman testified that under the contract, the Elegante agreed not to permit any entity other than Schindler to work on the elevators and that Schindler had control over the maintenance of the elevators at the Elegante. Freeman testified that industry standards available from

8

the National Elevator Institute (NEI) reflect that two to three callouts a year are "acceptable[]" for elevators at a hotel the size of the Elegante.

Freeman testified that an SDI board is "a position and velocity control board, speed board [that]…controls the speed [at] which the elevator will run." According to Freeman, an "SDI board should last almost the lifetime of the elevator[]" and it is not something that is routinely switched out and repaired. According to Freeman, over his career, he had never had to replace multiple SDI boards on an elevator in the span of a few months. Based on his review of the maintenance records for the Elegante elevators, Freeman testified that there were problems with doors on "probably 80 percent of the callouts" on Elevator No. 2, the elevator involved in the incident, and there were records of Schindler having to "reprogram or relearn" the elevators, which Freeman testified does not happen often. According to Freeman, reprogramming or relearning is "going back and resetting [the] elevator back up to run again [and] [i]t should never happen once it's been set up unless you have a [] bad board or something that needs to be changed." According to Freeman, he had not seen any evidence that power issues caused the incident with Ceasar.

Freeman testified about the service tickets for May 18; June 26, and 28; July 11, 19, and 28; and August 3, 6, and 13, 2017, for problems with power and fuses, SDI boards, doors, "rubbing and bouncing" due to a lack of oil, and other customer complaints. Freeman also testified about the service tickets for August 15, 16, 24,

9

and 31 and September 2, 5, 7, and 19, 2017, reflecting problems with the SDI board, showing "overspeeding," speed tests, and problems with the doors.

According to Freeman, every elevator malfunction creates a fault code that is stored in the elevator's electronic memory and shows the speed of the elevator, the reasons for an abrupt stop, and the location of the elevator when it stopped. Freeman testified that he inspected the elevator but was not able to inspect the fault codes because they were "gone." According to Freeman, it is "industry standard" to keep fault codes and part of the Texas Department of Licensing and Regulation (TDLR) inspection report requirements that fault codes be logged when normal maintenance or a "trouble call[]" occurs and "[t]hat's part of the maintenance control program, all fault codes in any instance be written down." Freeman also testified it is not necessary to delete fault codes to return an elevator to service. According to Freeman, the Schindler elevator mechanic deleted the fault codes, did not record the results of the speed tests, and there was no legitimate reason not to record the speed tests. Freeman testified that when he inspected Elevator No. 2, he asked Schindler to do speed tests, but Schindler refused.

Freeman explained to the jury that it is not typical for SDI boards to need work or replacement as frequently as the Schindler service tickets reflected, and the service tickets reflected that the SDI board in Elevator No. 2 had a problem both

10

before and after the incident. Freeman testified that he would not normally expect to see repeated instances of reprogramming and relearning, and:

> They were not properly maintaining them, and they were not fixing the problems. They either couldn't figure out what was wrong with it and just kept patching it or putting a Band-Aid on it and trying things. But, no, they [weren't] maintaining it to keep it in proper working order.

Freeman agreed that each elevator should have a "check sheet" for "the life of the elevator" to record when maintenance is done. According to Freeman, a typical check sheet does not look "freshly printed[,]" the handwriting will be in different colored inks, and older pages may fade or show spills. Freeman identified Exhibit P1-2 as a Schindler check sheet that he believed looked "brand new[]" and "freshly filled out[,]" and he thought P1-2 and P1-3 looked like they had been filled out by the same person. Freeman testified that he asked the Schindler workers who were with him when he did his inspection why the check sheets looked so fresh, and "[t]hey mostly just smiled at me and didn't say anything[]" and according to Freeman, they never denied that the sheets looked brand new.

According to Freeman, an inspection should be done annually to check the operation of the elevator and safety devices, and every five years, there is a full-load test, testing the elevator at full capacity and at "contract speed." Freeman testified that a full-load, five-year test for Elevator No. 2 was due in 2018, but to his knowledge, that inspection still had not occurred. In Freeman's opinion, the elevator

11

did not look clean or well-maintained, and it appeared that some parts had not been touched for a year or two.

Freeman testified that the elevator did not actually hit the top of the shaft because there is an overhead of a few feet, but that when an elevator stops abruptly as Ceasar described, it could feel like hitting the top of something. According to Freeman, if the elevator's SDI board was malfunctioning, it would cause a severe, abrupt stop because the SDI board controls the speed and position of the car.

Freeman agreed he reviewed the opinions of the defendants' expert Jon Halpern, and a drawing Halpern had done to calculate force was not accurate. According to Freeman, if someone sent him for a building assessment at the Elegante, he would recommend changing elevator companies because the maintenance was very poor, and he believed "the owner's not getting what they're paying for and they're having a lot of issues and inconvenience for their guests." During direct examination, the plaintiff's attorney asked Freeman "what's Schindler's general reputation in the elevator industry, especially here in the State of Texas?" Schindler did not lodge any objection to the question at that time, and Freeman answered, "they have a very poor reputation here in Texas." On cross-examination, Schindler's attorney asked additional questions of Freeman about his basis for stating that Schindler had a poor reputation and then on redirect examination, Ceasar's attorney asked further questions regarding Schindler's

12

reputation. The Defendant then lodged an objection that the "reputation" testimony was hearsay, and the trial court overruled the objection stating the defense had "opened the door" but otherwise instructed the witness not to repeat hearsay. Freeman also testified that he had seen no evidence that Schindler did a documented investigation after this incident to determine the root cause of this incident.

Freeman opined that based on his thirty-eight years in the industry, he did not believe that Schindler properly maintained the Elegante elevators, and he reached the conclusion that Schindler's poor maintenance contributed to Ceasar's incident because the callouts persisted before and after the incident. Freeman also believed that the SDI board may have caused the elevator to malfunction and stop unexpectedly because the SDI board controls the position and speed of the elevator and because the SDI board was malfunctioning both before and after the incident. In Freeman's opinion, an SDI board does not ordinarily fail if maintenance is properly done.

On cross-examination, Freeman testified that the Schindler employee, Michael Prudhomme, who had worked on the Elegante elevators, did not follow the proper procedures. According to Freeman, the fact that Elevator No. 2 did not stop at floor level and shut itself down meant everything was not properly working, and

> The elevator stopped when it went into the overhead. The code didn't stop it. The elevator stopped itself by mechanical switch. The code had nothing to do with it. The fault generated -- that situation generated a fault code. Didn't have anything to do with the elevator shutting itself

13

down other than a mechanical switch because the elevator overtravelled past the limit[.]

Freeman was unable to say whether the "overspeed governor tripped" or the "SDI board failed" on the day of the incident because there were no details in the records and no fault codes. Freeman agreed that the SDI board was replaced ten days before the incident and that a faulty SDI board or one that was installed incorrectly could have caused the incident.

On redirect, Freeman testified that, based on Freeman's reading of Prudhomme's deposition testimony, Freeman believed that Prudhomme deleted all the fault codes. Freeman testified that the work tickets reflect that Schindler spent eight hours adjusting the speed on the SDI board and four hours testing the backup speed system within three days of the incident, and Freeman thought that "[t]he only reason to spend 12 hours on an elevator [is] either you can't find the problem or you can't seem to get it under control." When asked whether the SDI board contributed to the incident, Freeman testified "I believe in the incident the way it's being explained to me that the car lost position and possibly oversped and both of them are controlled by the S[D]I board. So, more likely than not that I feel that it had something to do with the incident." According to Freeman, an elevator that is properly maintained would run for twenty-five or thirty years, "SDI boards don't normally go out[,]" the SDI board should "go out once to twice in the lifetime of the elevator[,]" and "I think there's a bigger issue here beside just the SDI board."

14

According to Freeman, Schindler should have investigated the incident regardless of whether Ceasar was injured and because they did not, the SDI board was replaced within a few weeks of the incident.

<u>Video Deposition Testimony of Marty Pulliam</u>

The plaintiff played a video excerpt of Marty Pulliam's deposition testimony for the jury. Pulliam testified that he worked for Investment Corporation of America (ICA), which is an investor in 904 Hotel Operating LLC (904), and 904 operates the Elegante. According to Pulliam, 904 and the Elegante relied on Schindler to take care of the maintenance and operations of the elevators, including matters relating to the function or malfunction of the elevators, preventive or routine mechanical maintenance, and safety inspections.

Pulliam identified the contract for preventive maintenance between Schindler and the Elegante, which was entered into on June 28, 2006, and was the same contract between the parties at the time of his testimony. The contract states that Schindler's preventive maintenance service includes:

[] Our preventive maintenance program performed in accordance with a maintenance schedule specific to your equipment[;]
[] Examine, lubricate, adjust, and repair/replace covered components[;]
[] Prompt callback coverage[;]
[] Safety testing[; and]
[] Customer friendly and responsive communications[.]

Pulliam also agreed that one provision of the contract required Schindler to do annual safety testing on the geared elevators and every five years on the fully-loaded geared elevators.

Pulliam agreed that the service ticket for June 28, 2017, showed that Elevator No. 2 was stuck on the eighth floor and that a blown fuse was replaced when Schindler came out. Pulliam agreed that for June, July, and August of 2017, there were numerous Schindler service tickets for the Elegante elevators, including three for problems with the doors not opening, complaints about door issues on two of the elevators within ten days of the incident, and a service call three days after work was done to replace SDI boards and a door operator. Pulliam was not aware of any fact that Ceasar did anything to cause the elevator to malfunction or failed to use ordinary care when he was on the elevator. Pulliam also agreed that Ceasar reported neck and back pain on the day of the incident.

Testimony of James Hoover

The plaintiff then called James Hoover as an adverse witness. James Hoover testified that he had worked for Schindler for the past thirty-five years, and he had worked in the elevator industry for forty-nine years. He had also worked for Otis, Dover, and Houston Elevator. Hoover agreed he was the Schindler account representative for the Elegante account and that the Elegante had been in his area of responsibility from the time the contract began.

16

According to Hoover, Schindler is the second largest elevator company in the world, and they manufacture elevators and service and maintain elevators. Schindler's preventive maintenance on elevators includes "machine maintenance to cleaning the pits, car tops, checking safety switches[,]" oil and lubrication, plus annual or five-year full-load tests and that Schindler has a written manual for preventive maintenance. Hoover testified that the schedule for maintenance is determined by Schindler, is set according to industry standards, is included in the "FieldLink materials," and Schindler does not generally provide the maintenance schedule to the customer. Hoover testified that the maintenance schedule is accessible to the field technicians through FieldLink, and they can access it through their phones. Ceasar's attorney asked Hoover why Schindler did not produce the maintenance schedule for the elevator in question, Hoover said he did not know, and the plaintiff's attorney asked Hoover why Schindler would say that maintenance procedures documents do not exist. Hoover responded that he "did not know." According to Hoover, there is a Service Delivery Manual that is one of the manuals that the technicians can access through their phones, and he agreed that the manual refers to the Elevator Industry Field Employee Safety Handbook and Schindler's safety policies.

Hoover testified he was not present for speed testing on Elevator No. 2 in the days following Ceasar's incident. Hoover further testified that he looked through a

17

year's worth of records for the Elegante and the only terminal velocity speed testing he found was for August 16, 2017. Hoover testified that Schindler did annual safety testing on the geared elevators prior to Ceasar's incident, and there was an unloaded geared safety test after his deposition in June 2018. Hoover did not dispute that in his deposition, he testified that Schindler did not do any safety testing except in October 2016. According to Hoover, Schindler was fully compliant with State of Texas requirements before the incident. He testified that annual testing was done on October 11, 2016, and the next annual testing would have been due on October 11, 2017, but it was delayed until April of 2018 due to Hurricane Harvey. Five-year full-load testing was done in 2013, and the next five-year testing was due in 2018, but that date was reset by the State until 2019 based on when the last annual test was performed. Hoover believed that Schindler had records going back five years.

According to Hoover, when the incident occurred in August 2017, neither he nor anyone at Schindler investigated why it occurred nor did they do a "root cause analysis," and Schindler was never told that anyone was hurt in the incident until the lawsuit was filed. Hoover testified "[t]o us, it was just a call that was -- the elevator was broke[n]. It was not anything that we would dig into to find out." For that reason, after the incident, "[t]here was nothing to check[.] The elevator had been running fine since that point." When asked about the four service calls in the two-months prior to the incident, Hoover responded that he did not believe that was excessive.

18

Nonetheless, Hoover also agreed that on August 13, 2017, the elevator Ceasar was on was malfunctioning, that people should not get stuck in elevators, and that if an elevator is working properly, it should not come to an abrupt stop. He also testified that the reason the fire department had to open the door on August 13th was due to a "safety feature[]" and when an entrapment occurs on an elevator and the elevator stops some distance from floor level, State code requires that the doors should not be opened except from the outside to prevent passengers from opening the door where it might be unsafe to exit the elevator car. Hoover testified that it is possible that an SDI board could need to be changed out only three months after the previous one was installed because the SDI board could have been a faulty board from the manufacturer or from environmental events, such as water. According to Hoover, the SDI boards in the Elegante were first-generation boards manufactured by Elevator Controls, and possibly the reason an SDI board had to be replaced three months after the last one was installed was because it was a first-generation board.

Testimony of Michael Prudhomme

The plaintiff then called Michael Prudhomme as an adverse witness. Prudhomme testified that he is a corporate representative for Schindler. He is also an elevator repair technician for Schindler, and he has worked for Schindler for more than three decades, and he has worked in the elevator industry for about forty years. According to Prudhomme, "elevators trap people every day. I mean, it happens. You

know, that's the way it is[,]" and he does not blame passengers for being scared when that happens. Prudhomme agreed that proper maintenance of an elevator makes it safer. He also agreed that, if an elevator is running properly, it should never go past the floor where it is supposed to stop. Prudhomme testified that "FieldLink" is an application that provides information about service calls, and a technician can then enter information on their company provided cell phone about service provided through FieldLink.

According to Prudhomme, whenever there is a problem with an elevator the Elegante would have a number that they could call to contact Schindler and then it would generate an entry into FieldLink for a Schindler repair person. For example, Plaintiff's Exhibit 10 showed Marcus who worked in maintenance for the Elegante had called to report a problem, but if it is an "entrapment" call they would call Prudhomme personally.

Prudhomme testified that he received a call, and he personally went to the Elegante immediately after being notified of the incident and when he arrived he found the elevator stopped "on the 9th floor with the doors open[,]" and he understood the firefighters had opened the doors and left them open. According to Prudhomme, there are many reasons an elevator could stop, including a passenger leaning against the elevator door. Prudhomme did not know whether the elevator

malfunctioned on August 13, 2017. Prudhomme also agreed that Schindler was in control of doing the maintenance on all the elevators at the Elegante.

The plaintiff's attorney cross-examined Prudhomme about eight service calls between August 13, 2016, and April 28, 2017, for Elevator No. 2. The service calls included complaints about being stuck on or between floors, the doors not opening properly, or what was described as "misleveling." According to Prudhomme, the Elegante elevators are about forty years old, they "never stop running[,]" and "[y]ou're gonna have problems…it's just the nature of what it is."

Prudhomme testified that he had been trapped in an elevator before and gotten people out of elevators "lots of times[,]" but in his entire career he had never seen anyone hurt from such events. Prudhomme did not know if Ceasar was injured or what type of injuries Ceasar had, and Ceasar was out of the elevator by the time he arrived at the Elegante. Prudhomme testified that if he had known there was an injury reported, he would have called a supervisor, who likely would have said to turn the elevator off and return the next day to work on it. When cross-examined about whether Schindler did a "formal investigation" of the incident, Prudhomme testified as follows:

> Q. Okay. You will agree with me that despite the fact that -- that Schindler -- or despite the fact that a fire department had to release a passenger in an elevator that Schindler maintains that was nine stories above the ground, Schindler conducted no formal investigation of this incident. True?

A. Well, I investigated the reason why it was broke[n] and got it running and ran it but --

Q. And you don't know why it was broken, do you?

A. Well, yeah, I know it says right there adjusted interlock, repaired, and return to service.

Q. But let me ask you this: You don't know what the fault code said sitting here today, do you?

A. I didn't have to look at the fault codes.

Q. Sir, my question is: You don't know what the fault code said sitting here today, do you?

A. It wasn't a fault, sir. I had to reset the I/O board. That's all I had to do.

Q. Sir, is it your testimony in front of the jury that it wasn't a fault?

A. Sir, all I said -- I don't know whether you're trying to cross me up. I said I had to reset the I/O board to get the car able to run. Jump out the final limit. I put it on independent service -- well, test, rather. Run it up and down the hoistway, I don't know, five or ten trips. Then went down there and rode the car. Found no problem. Return to service. Left. Well, got ticket signed and left.

. . . .

Q. All right. I already asked you was an investigation done. Was a root cause analysis done?

A. Root cause analysis was I found that the door lock had been clipped. I think it was the 8th or the 9th floor. I moved the drive block, adjusted the drive block because when I was on top the car you run on inspection to see that the clutch was hitting that block. That was the reason that it probably clipped the lock, had the car loss or whatever. That's what I had to do to get it to run. I didn't have any faults on the SDI board. If

22

the SDI board was faulted out, you would have to work on it; but I did not have to work on that.

Q. Sir, when did you -- when did you develop this specific memory of what you did to fix it that night?

A. Well, I mean, it's common knowledge if that's what the call was is what you have to do to get the elevator to run.

. . . .

Q. Is a fault code created?

A. I mean, it could be one created; but you'd have to go into the computer to find it.

Q. Did you go to the computer to see if a fault code –

A. I didn't --

Q. -- was created?

A. I didn't have to. It has an ANSI reset button on it. All I had to do is press the button to reset.

Q. Sir, I know. And when you reset it, it clears the fault codes, doesn't it?

A. No, it does not.

Q. Well, is the fault code still there where we can see it?

A. Well, it probably was there then; but it rolls off after each fault comes.

Q. You would agree with me a fault code was created, and it's probably rolled off now because it wasn't preserved. Yes?

A. The only fault it would have had that it was on the final limit, the switch was open, or it clipped the door lock. That would be it.

23

. . . .

Q. What are you looking at it on so the jury understands? What do you see the fault code on, a screen?

A. It has -- it has a small screen and it has diodes below that. That's little lights. You'll have lights flashing. Maybe it's 2, 3, 4, 8. Then you have a chart that tells you what 2, 3, 4, 8 is, you know; and it tells you what that fault is. And if that's not good enough, you can -- you've got DIP switches you can move in order to get into faults and you look at faults. But on this night, this elevator, it was above the floor so it was on what you call a final limit. It's a stopping switch. So, you have to -- the safety circuit was open. So, you have to jump that switch out to get the car to level back into the floor. Put it on test. You run the car. Top to bottom, top to bottom. You know, after it ran five or ten trips, go down, get on top of it. Ride the hatch and look and see what the problem was. I [saw] a clutch hitting the interlock. And that's what it says on there. I adjusted the interlock. Put the car back on automatic and rode the car, left it in service, got a ticket signed, talked to the lady at the front desk, and left.

Q. Is this all specific memory that you've had since the deposition?

A. Well, when you showed me the ticket that says this is what I did, yes. You have to remember that's over a year ago. I take lots of calls. I mean, I can't remember everything.

Q. Sir, the deposition -- the service call was shown to you in your deposition, as well, wasn't it?

A. But it says right there. What can I say I didn't do anything when it says I worked on the interlock. I don't understand what you're trying to say.

Prudhomme denied that he deleted fault codes, which would require going into the microprocessor, and he testified that service technicians ordinarily do not do that unless the elevator will not run at all. Prudhomme testified that the SDI board

24

has a reset button, and a reset is necessary to make the elevator operational again in some cases, but resetting a fault is not the same as "deleting a fault[.]" Prudhomme explained that there could have been a fault code created by this incident, but in order to find the code it would require going into the microprocessor. If a fault code was created, he believed in this case it would have said "safety circuit open."

According to Prudhomme, about seventy percent of calls on elevators are because of issues with doors and that "[n]ormally all elevators" have problems getting stuck between floors. In Prudhomme's opinion, the service tickets for the months prior to the incident did not suggest Schindler should have had prior notice of any incident similar to Ceasar's because they concerned what Prudhomme believed were "door problems or fuses blowing."

Testimony of Dennis Pellerin

Dennis Pellerin, a firefighter for the City of Beaumont, testified that on August 13, 2017, he was captain for the day, and Plaintiff's Exhibit 24 was his report from that day. Pellerin testified that his crew responded immediately after getting a call that a person was stuck in an elevator at the Elegante about 4:50 p.m. that day, and the firefighters arrived at about 4:55 p.m. Pellerin did not know how long Ceasar had been in the elevator. Pellerin testified that, upon arrival, they checked with the desk clerk to find out where the person was stuck in the elevator, they rode another elevator to the eighth floor, and they used an elevator key to open the doors to the

elevator in question. According to Pellerin, before using the key, they talked to Ceasar through the doors to let him know they were going to open the doors, and Pellerin testified that Ceasar answered their questions. Pellerin recalled that when the firefighters opened the door, Ceasar was standing with a pizza box in his hand, and he did not say anything to them that would indicate he was injured or hurt. Pellerin testified that by 5:13 p.m., the event was "cleared" and the firefighters then rode the elevator downstairs. Pellerin testified that he did not observe any obvious signs of injury on Ceasar, but the firefighters asked Ceasar if he needed any further assistance and offered him medical attention when he was released from the elevator, but Ceasar did not want any medical assistance. Pellerin did not recall the elevator not being level with the floor.

Plaintiff's Neurosurgeon Dr. William Brennan

Dr. William Brennan testified that he is a board-certified neurosurgeon with a practice in Lafayette, and he does spinal surgery. He testified that he has performed thousands of lumbar surgeries, like the surgery he performed on Darren Ceasar, as well as thousands of neck surgeries. Brennan testified that he is Ceasar's current treating neurosurgeon, and he last saw Ceasar in September 2018.

Brennan testified that he first examined Ceasar on October 12, 2017, and at that time Ceasar's chief complaint was neck pain, low back and left leg pain, insomnia, and anxiety, and Ceasar reported he had previously experienced similar

26

symptoms. According to Brennan, Ceasar reported that on August 13, 2017, he was in an elevator that accelerated past the floor he selected, the elevator went "all the way to the ceiling of the building and crashed to a stop at the top[,]" and Ceasar experienced a "sudden, painful jarring[]" and panic when he attempted to call for help and escape. In his initial examination of Ceasar, Brennan found Ceasar had twenty-five to fifty percent normal range of motion of the head and neck, diminished sensation on the outside of his left leg, and "positive straight leg raising[,]" or pain in attempting to straighten his left leg that was unlikely to be an orthopedic problem. Dr. Brennan described Ceasar's condition as "elevator induced trauma with anxiety; vivid unpleasant dreams of reliving the incident; neck pain; low back pain; left lower extremity, lumbar radiculopathy which is shooting pain in the leg."

According to Dr. Brennan, Ceasar was "very open" about the fact that he had been evaluated for back problems in the past, but Ceasar told Dr. Brennan he had not been under anyone's care for about a year when he saw Dr. Brennan. Brennan testified that he referred Ceasar to a psychiatrist for post-traumatic stress disorder and ordered an MRI scan of the cervical and lumbar spine. Brennan also prescribed hydrocodone, Ativan for anxiety, and some stomach medicine for heartburn.

Dr. Brennan agreed that an MRI was performed on December 1, 2017, and when he compared it to a previous scan, he concluded the more recent scan was "more abnormal." Ceasar's patient records state that his lumbar MRI scan showed a

27

"small focal disk herniation on the left at L5-S1." Dr. Brennan testified that Ceasar had back pain and an "aging disc[]" prior to the incident, and when a person has such an issue, they are more susceptible to being injured by unexpected events because a physical event such as being unexpectedly jarred in an elevator "will traumatize the weakest link before it will traumatize anything else." Based on the MRI of Ceasar's neck, Dr. Brennan concluded Ceasar also had a left-sided C6-7 disc herniation in his neck.

When Brennan saw Ceasar in January 2018, Ceasar was reporting low back pain and left leg pain that was worsening. At that point, Dr. Brennan ordered six weeks of physical therapy because it was a more conservative option than surgery, but he wrote in the patient records that "I feel it is more likely than not that in the next 5 years he will choose both the lumbar and cervical surgery[.]" Dr. Brennan agreed that in March 2018, the physical therapy facility wrote that Ceasar had been compliant with treatment but continued to have back and neck pain "with most activity." In June 2018, Dr. Brennan discussed surgery options, and Ceasar agreed to proceed with the back surgery. According to Brennan, two weeks after L5-S1 lumbar disc surgery, Ceasar had some improvement with his back and left leg, but he still had a slight limp. Brennan testified that five weeks after surgery, Ceasar continued to improve and no longer had any problem with straight leg raising. Brennan testified that at about seven weeks after surgery, Ceasar's back and left leg

pain had improved, but he was experiencing new pain in his back and numbness in his leg. Dr. Brennan believed that Ceasar's neck pain would also persist and Ceasar would probably need neck surgery in the future.

Dr. Brennan agreed that he treated Ceasar for about a year, he first tried conservative treatment measures such as pain management and physical therapy, and ultimately performed back surgery, but Ceasar is likely to have intermittent pain and discomfort for the rest of his life and Ceasar will need medication, medical care, and more surgeries based on his injury. Brennan agreed that based on reasonable medical probability he believed that all the care and treatment he gave to Ceasar was caused by and needed because of an injury sustained in the elevator incident in August 2017.

On cross-examination, Dr. Brennan agreed that he believed that Ceasar's problems started after the elevator incident based on what Ceasar told him. Brennan did not recall that Ceasar had told him anything about his prior back pain, that he did not know about a previous MRI and a lumbar herniated disc in 2013 nor did he recall anything about Ceasar being treated for back and neck pain in 2014. Brennan did not know whether his records indicated that Ceasar complained of pain and suffering, mental anguish, medical expenses, or loss of enjoyment of life prior to the elevator incident. But Brennan was aware that Ceasar had gone to Opelousas General Hospital four times in 2016 for similar problems with his back, and he testified that his patient records for Ceasar include a notation that he had been

29

evaluated for low back problems in the past, had MRI imaging, but Ceasar told him he had not had medical care for low back problems for a year or two before the elevator incident.

Testimony of Psychiatrist, Dr. Patrick Hayes

Dr. Patrick Hayes, a board-certified psychiatrist, testified that PTSD is a stress response that occurs when a person gets "stuck in fight or flight" after something bad happens, and it could result from being trapped in a confined space such as an elevator. Hayes testified that Ceasar was his patient, he was referred to him by Dr. Brennan, Hayes last treated Ceasar about two weeks prior to trial, and he planned to continue treating him until he got better. Hayes testified that he first saw Ceasar on December 15, 2017, and he and his staff have seen Ceasar for about fifteen months.

Based on his assessment of Ceasar, which included objective psychometric testing, he diagnosed Ceasar with PTSD. According to Hayes, Ceasar had been fully compliant with all his appointments, which was significant to Hayes because it lent credibility to Ceasar's report of distress, and that people who are compliant tend to be genuine. Hayes testified that Ceasar met the diagnostic criteria, including exposure to trauma, intrusive thoughts, nightmares, psychological arousal, and discomfort upon being forced to talk about something uncomfortable. Hayes believed that Ceasar had achieved about a ten percent improvement in his symptoms but that he would likely need care for about ten more years and that relapses were

probable. Hayes testified that, to a reasonable degree of medical probability, Ceasar's PTSD resulted from "the trauma of injury, of being scared and trapped in the elevator and then being mocked or his perception of being mocked and laughed at afterwards." According to Hayes, he saw no signs of malingering in Ceasar or that he was "embellishing his symptoms."

Testimony of Life Care Planner, Dr. Todd Cowen

Dr. Todd Cowen testified that he is a physician in the field of physical medicine, rehabilitation, and pain management, he has been in practice for almost twenty-five years, and he is board-certified in physical medicine and rehabilitation and in pain management. Cowen also testified that he is a certified life care planner, which involves identifying a person's condition, injury, or diagnoses, and mapping out the medical care the person is likely to need and what it will cost. Cowen agreed that over the years, he has treated thousands of patients with back and neck injuries and that his objective is to help his patients become as mobile and pain-free as possible. Cowen testified that many of his patients have orthopedic musculoskeletal spine injuries as well as PTSD, anxiety, and depression that accompanies their chronic pain or injury.

Cowen agreed that he examined Ceasar, he reviewed Ceasar's medical records, he talked with Drs. Brennan and Hayes and reviewed their treatment notes. Cowen testified that, in addition to exhibiting symptoms of PTSD, Ceasar had "both

31

neck and back pain. Back pain was radiating primarily down the left leg. He also had pain radiating between his shoulder blades, had some restricted range of motion in his lumbar and cervical spine, back and neck pain." Cowen agreed that he had reviewed the billing records for Ceasar's treatment, and he believed the charges were causally related to the elevator incident and were reasonable, usual, and customary for the region where Ceasar lives. Plaintiff's Exhibit 108 was admitted into evidence as a medical billing summary, and Cowen testified that the exhibit showed a total of $89,754.82 in past medical bills.

Cowen testified that the life care plan he developed for Ceasar was based on a life span of an additional thirty-three years, it included doctors' visits, injections, diagnostic tests such as MRI's and X-rays, medications, physical therapy, nursing care, injections, surgical procedures, and essential services, and applying usual and customary costs, and the total cost estimate of future care was $759,731.59. Cowen testified that, after correcting for procedures that have already occurred and changes in medications, the adjusted total for the life care plan was $781,085. Cowen testified that Dr. Brennan had recommended Ceasar undergo a cervical fusion within the next few years, and Cowen used Dr. Brennan's quote for the costs associated with that procedure. Cowen also estimated that Ceasar would require another fusion at about age 68 because "whenever one segment of the spine is fused, the segment above or below will take more wear and tear and will likely need a fusion down the road."

Cowen also testified that it was possible Ceasar would require posterior lumbar fusion at age 60, but he did not include a cost for that because it did not rise to the level of probable.

Cowen agreed that all the medical care included in his life care plan was caused by the August 2017 elevator incident, to a reasonable degree of medical probability, and was based on what Ceasar told him as well as the medical records from other physicians. On cross-examination, Cowen agreed he had looked at Ceasar's records prior to the accident, from 2010 to 2016.

Testimony of Defense Medical Expert, Dr. Warren Parker

The defendant called Dr. Warren Parker as an expert witness. Dr. Parker testified that he is a board-certified neurosurgeon and has been in practice for about forty-five years. Parker stated that, after medical school, he served for two years in the Army, including a year as a flight surgeon investigating aircraft accident and performing flight physicals, and he also was President George H.W. Bush's physician and neurosurgeon for a time. Parker testified that he was asked to review records, X-rays, and MRI scans for Darren Ceasar, including records for about eight or nine years, and in his medical opinion, Ceasar did not sustain an injury in the August 13, 2017 incident:

> Every doctor that Mr. Ceasar saw, his examination was normal. The X-rays or MRI scans showed this normal wear and tear or arthritic changes that were present long before this incident. His complaints are all subjective[,] which means that the doctors or anyone else could not

33

confirm them….So, the only way we know Mr. Ceasar has back and neck pain is because he tells us he does basically. And that pain will go away when he tells us it's gone away.

. . . .

My reviewing the medical records, personally looking at all of the X-rays, MRI scans that were provided me, and there was no evidence of any injury, no dislocation, no fracture, no swelling of any injury, no indication of an injury at all.

Parker testified that prior to Ceasar's July 2018 surgery, there was no ruptured disc, and there was a bone spur that had developed over the preceding years, and the surgery was not necessary. Parker saw no difference between Ceasar's 2016 and 2018 MRI scans. Based on his review of Ceasar's medical records, Parker concluded that Ceasar had three or four injuries to his spine, including a car accident in 2014. Parker agreed he reviewed Dr. Cowen's life care plan for Ceasar, and he testified that Cowen, as a physical medicine and rehabilitation physician, was not qualified to read MRI and radiographical studies.

On cross-examination, Parker agreed that Ceasar was not his patient, he was not his treating physician, and he had never examined Ceasar. Parker also testified that he was being paid about $16,500 for his work for Schindler in reviewing the medical records and testifying. Parker also agreed he had not met Dr. Cowen and did not know the details of his education and professional background.

Testimony of Defendant's Elevator Expert, Jon Halpern

Jon Halpern testified that he is an elevator consultant and a licensed consulting engineer and that he was asked to look at the records and give an opinion about

34

"what occurred in this matter and what didn't occur in this matter and whether or not anything the defendants did or failed to do caused the accident." Halpern testified that he had been in the elevator business about thirty-nine years, and he had had his own company for about eighteen years. Halpern stated he had previously worked for Millar Elevator Industries, which was purchased by Westinghouse Elevator, and which Schindler later purchased, and he was with Schindler from 1990 to about 2001. Halpern agreed he was familiar with the elevator controller involved in this case, an Elevator Controls Model B900. Halpern testified that he inspected Elevator No. 2 at the Elegante and reviewed work tickets, inspection records, deposition testimony, and manuals for the B900 controller.

Halpern testified that there is a controller on the left side of Elevator No. 2, and on the right side there is an overspeed governor that acts as an independent monitor of speed that will trip if the elevator "overspeeds" and will need to be manually reset. If the elevator car goes past the top floor, a counterweight goes down and compresses a buffer at the bottom of the shaft, which acts as a hydraulic brake to stop the car in a safe manner. At the top are "final limit" switches, and if the car goes past the final limit, the car cannot run again or go back into service unless someone takes off the final limits by bypassing electrical switches.

Based on his review of this case, Halpern concluded that on August 13, 2017, there was nothing in the records to indicate the elevator did not experience a safe

35

stop, and "it's just not possible that [the elevator] struck the buffer. It's not possible that it went far into the overhead and made this crashing stop" like Ceasar reported. Halpern believed that the elevator did not make "a completely level stop" and went about three inches beyond the door zone and the doors could not open. According to Halpern, Elevator No. 2 has an electrical door zone of plus or minus three inches, so that if the car is outside that zone, the doors will not open to prevent passengers from tripping. In Halpern's opinion, Elevator No. 2 had been tested properly prior to the incident.

After reviewing the service tickets in the months preceding the incident, Halpern concluded that although there were records of the certain shutdowns and the elevator being stuck, "there was no evidence of the elevator ever going into the overhead or past the terminal limits and making any kind of terminal limit stop or what I would call buffer stop in any way on the elevator." According to Halpern, issues with doors not opening or closing were not related to an unscheduled stop because the door operator does not cause the car to stop and only operates when the car is stopped. Halpern also did not believe the records in this case reflected prior notice of a safety issue that should have led Schindler to take the elevator out of service.

Halpern testified that it is not possible to erase fault codes, and old fault codes will "fall[] out[]" over time as new fault codes come in. According to Halpern,

36

resetting faults is a different matter, and if a fault is preventing an elevator from running, a mechanic will reset the fault. Halpern also testified that Schindler acted as a reasonably, prudent elevator maintenance company in maintaining Elevator No. 2, they performed maintenance on a regular and systematic basis, and there were no safety problems that would require taking the elevator out of service. According to Halpern, a properly maintained elevator can malfunction, and a malfunction does not mean the elevator maintenance company is negligent.

On cross-examination, Halpern agreed that he wrote in his report "the exact cause of the subject incident is unknown." Halpern also agreed that he wrote in his report that the problem could have been caused by the SDI board or power surges. Halpern also agreed that his report stated, "it is undisputed that the elevator ran past the up normal and final limit and likely contacted the buffer[]" and he had changed his opinion about this. On redirect, Halpern agreed that malfunctions can occur on elevators for reasons that cannot be determined even though the elevator is properly maintained.

Testimony of Elizabeth Pearson

Elizabeth Pearson testified that she is the tavern manager for the Elegante and on August 13, 2017, she was the manager on duty for the hotel. Pearson testified that when she saw a fire truck at the hotel, she asked at the front desk what happened, and learned a man who was stuck in an elevator on the ninth floor had called 911.

37

Pearson recalled seeing Ceasar after he was let out of the elevator when he went to the front desk to request a different room. According to Pearson, Ceasar did not appear injured, nor did he say he was injured, but he looked "[a] little rattled[.]" Pearson testified she saw Ceasar again about an hour later after the front desk told her that Ceasar wanted to speak to a member of management, and Ceasar told her he was checking out and going to go see a doctor. Pearson also testified she saw Ceasar's Facebook Live video, and she did not recall that Ceasar had said he was injured in the video. Pearson did recall that Ceasar appeared agitated, and he kicked the elevator door and tried to open it.

According to Pearson, when a person is injured at the Elegante, the hotel takes a statement from the person and sends it to the general manager, who forwards the statement to the corporate office. Pearson testified that she obtained a written statement from Ceasar, she signed and dated it, she called her manager at home, and she gave Ceasar the manager's business card, and she did not notify Schindler. Pearson did not know of any instances in the past where Elevator No. 2 had made an unscheduled stop or passengers had been injured. On cross-examination, Pearson agreed that Ceasar had written in his statement that he was feeling pain in his neck and back.

Testimony of Logan Conner

Logan Conner testified that he was one of the firefighters on the scene and Dennis Pellerin was the captain. Conner testified that when the firefighters arrived, they were told which elevator's doors would not open, he retrieved a key from the chief's car, and they used the key to open the elevator door. Conner recalled that the elevator was even with the floor "because we were on the first floor." According to Conner, Ceasar walked out of the elevator with a pizza. Conner testified that Pellerin asked Ceasar if he was okay, Ceasar was eager to return to his room, and Pellerin told Ceasar he needed to get information from him. According to Conner, Ceasar had no outward signs of injury and when asked how he was, Ceasar replied "I'm good[,]" and Conner thought there was no reason not to take Ceasar at his word. On cross-examination, Conner testified that he did not recall that the elevator was stuck on the ninth floor, and he agreed he did not really remember the day of the incident.

Jury Verdict

After trial, the jury returned a 10-2 non-unanimous verdict. The jury answered "yes" to the question whether negligence by Schindler caused the elevator incident on August 13, 2017. The jury did not find gross negligence by Schindler. The jury awarded a total of $841,754.82 in damages—$89,754.82 for past medical expenses, $150,000 for future medical expenses, $200,000 for past physical pain and mental anguish, $250,000 for future physical pain and mental anguish, $75,000 for past

physical impairment, $75,000 for future physical impairment, $1,000 for past disfigurement, and $1,000 for future disfigurement.

## Issues

Appellant raises the following issues on appeal.

1. "The court erred by excluding evidence that, before the elevator incident, Ceasar applied for and was denied Social Security disability benefits for severe back and neck injuries."

2. "The court erred by excluding evidence of a prior lawsuit in which Ceasar claimed that a 2014 auto accident injured his back and neck."

3. "The court erred by forcing Schindler and its trial team to engage in document production during the trial, after the discovery deadline."

4. "The court erred by imposing sanctions on Schindler for alleged pretrial discovery abuse."

5. "The court erred in instructing the jury on *res ipsa loquitur*."

6. "The court erred by refusing to instruct the jury on Ceasar's intentional spoilation of evidence."

7. "The court erred by denying Schindler's motion for a mistrial."

Appellant asks this Court to vacate the final judgment, remand for a new trial, and reverse the post-trial order imposing sanctions on Schindler.

## Exclusion of Evidence

Appellant's first two issues pertain to the exclusion of certain evidence. Issue one concerns the exclusion of evidence that Ceasar had applied for Social Security

Disability benefits (SSD) and that the claim was denied. Issue two concerns the exclusion of evidence of a 2014 lawsuit Ceasar filed after a car accident.

Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *Id.* (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). "The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018). Even if the trial court abused its discretion in ruling on the admission or exclusion of certain evidence, reversal is only appropriate if the error was harmful—that is, it probably resulted in an improper judgment. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *see also* Tex. R. App. P. 44.1, 61.1. We will uphold a trial court's ruling on the admission of evidence if there is any legitimate basis for the ruling. *See Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 762 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g)); *see also Malone*, 972 S.W.2d at 43 ("An

41

appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling."). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the evidence excluded or admitted. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (citing *Alvarado*, 897 S.W.2d at 754).

"Relevant evidence is presumed to be admissible." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018) (citing Tex. R. Evid. 402). Evidence that has no relationship to any issue in the case is not admissible under Texas Rules of Evidence 401 and 402. *See Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (citing Tex. R. Evid. 401, 402, 702; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995)). Relevant evidence may nonetheless be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. *See JBS Carriers, Inc.*, 564 S.W.3d at 836 (citing Tex. R. Evid. 403).

Social Security Disability (SSD)

Appellant argues that the SSD evidence was "highly relevant to Ceasar's alleged damages and his credibility[]"—that the SSD evidence could have convinced the jury that Ceasar's back and neck injuries were preexisting conditions and originated prior to the elevator incident and that the jury could have concluded that Ceasar was not truthful in claiming he was injured in the elevator incident. Appellant

denies that the SSD evidence was cumulative but rather it was "unique[,]" and that because Ceasar was denied SSD benefits, the jury could have concluded Ceasar had a history of not being truthful about his alleged injuries. According to Appellant, the trial court erred in excluding the SSD evidence based on the collateral source rule because the denied benefits application was not a collateral source of payments to Ceasar for injuries that he allegedly sustained in the elevator incident.

Prior to trial, Ceasar filed a motion in limine asking the trial court to exclude evidence that he was receiving benefits from a collateral source, including disability benefits. At a hearing on the motions in limine, the trial court stated:

> No. 5 deals with collateral benefits or collateral source. I mean, generally the evidence of collateral source is not admissible.
> . . . .
> I'm going to grant No. 5 at least as it pertains to a collateral source. I mean, I think what you may be discussing, I don't know if that really falls within the purview of No. 5 but by and large the evidence of the medical funding companies, what they do, how they operate, or that they had actually purchased or acquired any of the debts of the plaintiff related to his treatment, that I don't think is relevant and we shouldn't get into. If you want to ask him about his physicians and his treatment and the treatment he underwent, I think that's probably fair game.
> . . . .
> [] If you think there's something that becomes relevant, if you think it's something that potentially run afoul of the Motion in Limine, then come forward[].

During its opening statement, Schindler's counsel stated that "[t]he evidence will also show that [Ceasar] applied for Social Security Disability benefits" for injuries allegedly received in 2013. At that time, the court instructed the jury that any

43

reference to Ceasar applying for or receiving governmental assistance or benefits was "not germane or relevant" and should be disregarded.

The following day, outside the presence of the jury, counsel for Schindler argued that evidence of Ceasar's application for SSD did not violate the collateral source rule because it pertained to a different incident three years prior to the incident at the Elegante. The court responded that it would have been fine to refer to Ceasar having made prior statements about injuries he previously received but that a statement "dealing with an application or seeking benefit on a possible collateral source…ran afoul of the Court's motion in limine[.]" Later that day, when cross-examining Dr. Brennan, counsel for Schindler asked "[a]re you aware, sir, that totally unrelated to the elevator accident, three years earlier, [Ceasar] applied for SSI disability?" Outside the presence of the jury, the trial court stated that it had previously admonished the parties to approach the bench prior to asking about the application for SSD and that any further disregard of the court's motion in limine would be regarded as deliberate and would likely result in sanctions. Counsel for Schindler again stated that the SSD was three years earlier and was not a collateral source. The court again instructed the parties not to raise the issue of SSD without first approaching the bench.

The next day at trial, outside the presence of the jury, plaintiff's counsel expressed concern to the trial court that Schindler's counsel was going to cross-

44

examine Ceasar on his application for SSD. The court explained that the ruling on the motion in limine was not a ruling on the admissibility of SSD evidence, stated that its relevance had not been shown, and concluded that, even if admissible, such evidence was more prejudicial than probative:

> The Court is vested with the discretion to make corrective rulings where even though evidence may otherwise be admissible, I can preclude it from being admitted because of violations of other instructions or orders of this court.
> . . . .
> I have yet to see the significance of why the fact that it was made in an application for Social Security Disability benefits is of any importance or relevance whatsoever.
> . . . .
> You have expressed that your intention is to talk about this may have been a preexisting injury, that that's a portion of your defense and I'm giving you sufficient latitude to be able to do that. The fact that you want to display to the jury that he applied to the government for benefits, I don't see the significance or the probative value of that. And certainly[,] to the extent that there is any, the fact that somebody would be making an application for benefits on Social Security Disability [that] was denied, any prejudicial effect or negative correlation of that would substantially outweigh the probative value of the fact that the application was going for disability.

The trial court also stated that the purpose of the application was "separate and distinct" from a statement about an injury made on the SSD application and that "if there's a valid dispute about statements that were made in prior years relating to that injury, I think you could be able to cross-examine that sufficiently…with the witness."

45

Schindler argues that the exclusion of SSD evidence was in error and harmful and probably caused the rendition of an improper judgment because the SSD evidence could have convinced the jury that (1) the injuries Ceasar claimed resulted from the elevator incident were preexisting conditions and (2) Ceasar had a history of not being truthful about his back and neck ailments. The appellate record does not reflect that Schindler made this second argument—that Ceasar had a history of being untruthful about injuries—in the trial court, and Schindler has waived error on this point. *See* Tex. R. App. P. 33.1.

Schindler did argue in the trial court that the SSD application was admissible to show Ceasar was previously injured, to rebut Ceasar's claim that his injury resulted from the elevator incident, and for impeachment purposes. However, Schindler made no attempt during trial to offer the specific statements or medical information contained in the SSD application, and by failing to make an offer of proof, it has failed to preserve error. *See Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018) ("If a court ruling excludes evidence, a party must preserve error by filing an offer of proof informing the court of the substance of the excluded evidence. Tex. R. Evid. 103.").

While it is possible that statements made in an SSD application and possibly medical records attached to an SSD application may contain information that could be relevant to establishing a party's preexisting condition, we cannot speculate about

46

the contents of Ceasar's SSD application because Schindler failed to make an offer of proof. We also note that during the trial, Ceasar testified that he told the hospital in Port Arthur that he previously had back problems and a herniated disc, which was reflected in the hospital records admitted into evidence. He also testified that he had been treated for prior back pain by Dr. Metoyer, and Dr. Metoyer's records for Ceasar in 2014, 2015, and 2016 were admitted into evidence. Ceasar also agreed he had sought treatment at Opelousas Hospital and University Hospital in Lafayette for back pain. Dr. Brennan testified that Ceasar had been "very open" about having previously been evaluated for back problems and that Ceasar had back pain and an "aging disc[]" prior to the elevator incident. When Dr. Brennan compared Ceasar's December 2017 MRI with a scan from 2016, he concluded the December 2017 scan was "more abnormal." Therefore, exclusion of the SSD application or preventing Schindler from asking further questions about the SSD application and denial of benefits did not prevent Schindler from cross-examining the medical witnesses and Ceasar about the preexisting injuries.

We cannot say that the trial court's ruling excluding reference to the SSD application was outside the zone of reasonable disagreement or that the trial court acted without regard to guiding rules or principles. Additionally, Schindler has not established the exclusion of such evidence probably resulted in the rendition of an

47

improper judgment. *See Waldrip*, 380 S.W.3d at 132; *Armstrong*, 145 S.W.3d at 144.

We overrule Appellant's first issue.

Evidence of Prior Lawsuits

In a pretrial motion in limine, Ceasar asked the court to exclude evidence of any previous lawsuits, including lawsuits in 1997, 2002, and 2014, because they were not relevant and because any probative value would be outweighed by the prejudicial effect of the evidence. In a pretrial hearing, the court granted the limine with the following condition:

> I essentially kind of look at a 10-year window of relevance. It doesn't mean that anything outside of ten years is not admissible and not relevant. It just would…need to have a higher showing of relevance to the instant litigation the older the prior lawsuits become.
> . . . .
> []If there is something that is within 10 years, again consistent with the prior ruling that I've got. It doesn't mean that it's not admissible. It just means that we'll need to have some sort of a showing of relevance anything outside of 10 years and that might turn on each individual lawsuit. So, one of these if it's from 2014 obviously in the 10-year rule.

Plaintiff's counsel argued that evidence of a prior lawsuit was "really prejudicial" and asked that, prior to introducing evidence of a prior lawsuit, counsel approach the bench, and the trial court agreed. During a discussion at the bench during trial, the court stated:

> [W]hether or not the plaintiff had initiated legal proceedings or had filed the lawsuit or had to seek legal redress in regards to that purported injury, ultimately, that is not very relevant. I do not necessarily find that to be relevant absent a specific and particularized showing of relevance.

48

According to Appellant, the court erred in excluding evidence of the 2014 lawsuit and such error was harmful because such evidence tended to show that Ceasar's back and neck problems were preexisting conditions not caused by the elevator incident. Appellant also argues that it is "the longstanding general rule" in Texas that "a defendant may cross-examine a plaintiff regarding previous injuries, claims, and actions when they are relevant to show that the plaintiff's present physical condition is not the result of the injury presently sued for, but was caused in whole or in part by an earlier or subsequent injury or a preexisting condition[,]" citing to *Farmers Texas County Mutual Insurance Co. v. Pagan*, 453 S.W.3d 454, 462 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In *Pagan*, the Fourteenth Court explained that testimony about prior injuries, claims and actions would be relevant to the issue or other plausible causes of the plaintiff's injuries. *See id.* But it would not necessarily mean that it grants "a free ticket to admission of evidence," and that evidence may still be excluded as unduly prejudicial under Rule 403. *See id.* (quoting *Baker v. Dalkon Shield Claimants Tr.*, 156 F.3d 248, 252 (1st Cir. 1998)).

The trial court ruled during the pretrial and opening statement that the evidence of the 2014 car accident and lawsuit was inadmissible unless Schindler approached the bench and made "a specific and particularized showing of relevance." Schindler never made any offer of proof regarding the questions,

pleadings, or materials it sought to introduce from the 2014 accident and lawsuit, and thereby failed to preserve error on the exclusion of this evidence. *See* Tex. R. Evid. 103; *Gunn*, 554 S.W.3d at 666. Schindler also failed to establish that exclusion of the evidence of the 2014 lawsuit probably resulted in the rendition of an improper judgment. *See Waldrip*, 380 S.W.3d at 132; *Armstrong*, 145 S.W.3d at 144. Accordingly, we overrule Appellant's second issue.

Production of Documents During Trial

Appellant argues that the trial court erred by forcing Schindler's trial attorneys to produce documents during trial. Appellant argues that the burden of locating and producing client documents during trial was "highly distracting[.]" Appellant also argues that forcing it to produce materials after trial served "no obvious purpose." According to Appellant, plaintiff's counsel had never filed a motion to compel, and the disputed documents were not encompassed by plaintiff's Requests for Production. Appellant also argues that by forcing Schindler to produce documents during trial, the trial court violated Rule 190.3, which requires that "[a]ll discovery must be conducted during the discovery period[.]" *See* Tex. R. Civ. P. 190.3(b)(1).

We review a trial court's ruling on discovery matters under an abuse of discretion standard. *See Pape v. Guadalupe-Blanco River Auth.*, 48 S.W.3d 908, 912 (Tex. App.—Austin 2001, pet. denied). A trial court abuses its discretion when it renders an arbitrary and unreasonable decision lacking support in the facts or

circumstances of the case or when the trial court acts arbitrarily, unreasonably, and without reference to guiding rules or principles. *See Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011) (citing *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)). A court may modify a discovery control plan at any time and must do so when the interest of justice requires. *See* Tex. R. Civ. P. 190.5.

Plaintiff filed a motion for sanctions during trial, on March 29, 2019. Therein, Plaintiff represented that it had served Requests for Production of documents relating to policies and procedures, including:

> [RFP No. 13]: All documents related to the safety procedures and instructions related to the Elevator at issue.
> [RFP No. 29]: All documents that refer, concern, or relate to safety manuals and policies at the Facility.
> [RFP No. 30]: All documents that concern, refer, or related to any work procedures that were being performed in the facility where the accident occurred on the equipment/line involved in the accident when the Accident occurred.
> [RFP No. 40]: All documents that refer, concern, or relate to policies, procedures, and/or manuals that detail how you plan for or attempt to mitigate the risk of Accidents and/or releases at the Facility.
> [RFP No. 66]: Copies of all documents, including policies and instruction manuals which the Defendant provide[s] its employees during the hiring process and/or to contractors hired by you.

Plaintiff also requested work order tickets as follows:

> [RFP No. 14]: All documents and/or communications related to the last time someone complained about malfunctioning Elevators at the Facility for the past ten (10) years.
> [RFP No. 15]: All documents related to the last time Defendants performed repairs on the Elevator that caused the plaintiff[']s injuries

51

and other elevators located at the Facility where the injury at issue occurred.

[RFP No. 16]: All documents related to the maintenance and repairs of the Elevator in question and/or other Elevators located at the Facility for the past ten (10) years.

[RFP No. 37]: All documents that refer, concern, or relate to maintenance and work order history, repairs, alterations, inspections, corrections, and improvements on the equipment and/or area involved in the accident for the past ten (10) years.

[RFP No. 47]: All documents that concern, refer, or relate to repairs, renovations, changes, or alterations to the area of the Facility where the Accident occurred after the Accident.

[RFP No. 73]: All documents concerning any requests to repair, maintain, service, and/or inspections of the Elevator in question.

[RFP No. 74]: All invoices, requisitions, logs and other similar documents that concern any repairs, alterations, inspections, corrections and/or improvements to any part [of] the Elevator in question.

The motion stated that "Schindler failed to produce responsive documents."

Later during the discovery period, on June 28, 2018, Plaintiff deposed James Hoover, Schindler's representative for its account with the Elegante. The following exchange occurred:

Q. How long do y'all keep your work orders and call-outs for?

A. Probably go back to -- probably back to '07.

Q. Got it. So they're all just on the computerized system?

A. It's on computer, yeah. It's all backed up.

Q. You can kind of just go in and pick the -- the job or pick the location and then pick the dates –

A. Right.

52

Q. -- and be like, hey, I want all the preventive ones, I want all the service calls, and you just print them out?

A. Correct.

Q. I got it. And that's pretty easy to access, I imagine?

A. Well, they have to request it through us and it has to be approved to go through because there's too much information there.

Q. I guess I'm -- I'm talking past you. It's easy for Schindler to access?

A. Well, true, for Schindler to access, correct.

. . . .

Q. Does Schindler have any policies and procedures that relate to doing your preventative maintenance?

A. Yes.

Q. Are they written?

A. Yes.

Q. And those are easily accessible, as well?

A. Correct.

Q. And so if we wanted to look at those -- and the reason we look at them in these cases is just to see if what you-all -- your own internal standards are for yourself -- you have those written up?

A. They -- I'm not saying I can release them.

Q. He's the boss?

A. I'm pushing it over to the lawyer.

Q. But they exist?

53

A. Yes.

Q. And I guess -- I'm not going to talk to you about any of that today because the better way to do it is for me to look at the policies and then see if I have any questions, but for any of these policies that relate to safety inspection, maintenance, you know, even incident investigation, those are all -- you'd look at Schindler's policies and if your attorney let's you, then we can look at them?

A. Correct.

Q. But those policies do exist, they're formal policies, you can print them out?

A. That's correct. Legal will have to tell you if you can do that.

Later that day, Plaintiff's counsel sent an email to Schindler's counsel requesting that Schindler supplement the documents it had produced, including work tickets for the last ten years and "[a]ll policies and procedures for elevator maintenance and incident inves[ti]ga[ti]on[.]"

In November 2018, Schindler produced supplemental responses to Plaintiff's requests for production. As to requests to produce policies and procedures manuals and complaints about the Elegante elevators, Schindler responded that it had no responsive documents and referred Plaintiff to the Elegante. As to the request for policies and manuals provided to employees upon hire, Schindler responded that the request was overly broad and irrelevant. As to the requests for work tickets, Schindler objected that the request was overly broad and produced four months of service tickets, a Texas Certificate of Compliance, and a TDLR Report of Inspection.

54

Plaintiff's counsel represented in its motion for sanctions that it relied upon Schindler's representation that these documents did not exist and proceeded to trial. During direct examination of Hoover at trial, when asked whether Schindler had provided any policy or procedure to teach how to safely maintain the elevators, Hoover responded "[y]es…There is a manual[]" given to him and the service technicians, and it was available through the FieldLink app. Hoover also testified there was a field superintendent operation manual and safety procedures and instructions. Hoover agreed that Schindler also provided written procedures on how to do maintenance that were available through FieldLink. The following exchange occurred:

> Q. Do you…have any idea why when those documents were asked for so we could take a look at them that Schindler would say that those documents don't exist at all?
>
> A. Schindler said they don't exist?
>
> Q. Yes, sir.
>
> A. Well, our maintenance procedures are there.
>
> Q. They exist, right?
>
> . . . .
>
> A. Yes.
>
> Q. So, you don't have any idea why Schindler would say those procedures don't exist, do you?
>
> A. No.

55

Q. Those are things you look at and your guys look at all the time?

A. Correct.

Q. You would agree with me that it's important for all of us to be able to see those documents, right?

A. Yes.

Q. It's something, though, you think that you can get your hands on or you can help your lawyers look for, right?

A. Yes.

The following day, in a hearing outside the presence of the jury, Schindler's counsel stated, "if we didn't produce something and there is an oops, we'll take care of it[]" and that Plaintiff's RFPs were "accidentally misread[.]" The trial court stated:

> Obviously if there were corporate documents and materials pertaining to how an employee is to conduct certain maintenance or certain work, that would be, of course, very relevant to determine whether or not the technician in this particular case had conducted themselves consistent with internal company guidelines and policy or had deviated from those policies. Because of the nature of those materials, I instructed the parties to make the best effort to produce them to the other side so that the witnesses could be properly questioned as to those materials.
> . . . .
> [M]y understanding is those materials still have not been produced.

Schindler objected that discovery was closed, and Plaintiff could not ask for additional documents. The trial court responded as follows:

> I'm allowed to reopen discovery at any time for good cause.
> . . . .

[W]hen a request was made, they were told [the documents] did not [] exist. From the sworn testimony of this witness, they do apparently exist. I do find them to be relevant. I do find them to be the nature of where they should have been produced and I am instructing the party to produce them based on, if nothing else, the live testimony of the witness that was presented.

. . . .

The main crux or focus on this case tends to be on the repair and maintenance of the elevators, proper repair and maintenance.…the Court has the ability, upon a finding of good cause, to grant a party leave of court and request discovery in which I find in this case given the witness'[s] response yesterday to materials that appear to be very relevant that were never produced.…I'm instructing the parties if they have those materials that they produce them to the other side so that they can be reviewed and referenced for evidentiary purposes for the remainder of the case.

Counsel for Schindler told the court "[t]hey're readily available[]" and that he had the Schindler Service Excellence Service Delivery Manual, but he was advising his client that it was not requested. The trial court stated that if it determined there had been a discovery violation, it would sanction Schindler. The trial court also ordered production of service tickets for the twelve months prior to the incident.

The following day, Plaintiff's counsel told the court that the Service Delivery Manual that Schindler produced referred to an Elevator Industry Field Employee Safety Handbook, the current Schindler Safety Policies, Schindler Region Safety Health and Environmental Manual, and Schindler's Motor Generator Set Maintenance Manual. Plaintiff's counsel also stated that the named documents were relevant to its previous discovery requests. The trial court stated:

57

> I think to say that a safety manual or an employee handbook that deals with proper maintenance in an elevator in a lawsuit involving -- with the allegation that the elevator was not properly maintained, to say that we didn't think that was relevant to the discovery or germane to their request is probably disingenuous.

Counsel for Schindler argued that it was "unfair and unjust" for the court to order production during trial. The trial court ordered production of materials relating to safety, which were "extremely relevant and germane" to the issues being tried.

Later that day, counsel for Schindler stated it had located three of the manuals. After reviewing the documents, the court stated that only the table of contents had been produced for the Field Safety Health and Environmental Manual, specifically found the Field Safety Handbook and the High Risk Quick Book relevant, and ordered they be produced. Schindler's counsel argued that it was unfair to have to produce documents he had not read, and the court responded that it was reasonably known and foreseeable that such documents would be discoverable because they deal with the safety and maintenance of an elevator. The court also stated that production of the documents should not "come as a complete blindside" and did not constitute unfair surprise.

Counsel for Schindler continued its efforts to locate the final policy materials. On the final day of testimony, Schindler's counsel told the court "I can't give up documents, even with a court order, that I've never seen." The court responded that the documents at issue were "standardized corporate policy materials[]" that are

generally vetted by corporate counsel and that "if your client didn't apprise you of the existence of these materials until the middle of trial, that's really on your client and not necessarily on you." The court reiterated that it had ruled the documents should have been disclosed in advance of trial and instructed Schindler's counsel to tender the documents to Plaintiff's counsel. Later that day, counsel for Schindler told the court it had four documents and was prepared to produce them. Plaintiff's counsel identified six sections of a safety manual that it had not received, and Schindler's counsel gave the court a thumb drive containing the documents.

Prior to closing arguments, at a discussion at the bench, Plaintiff's counsel told the court it had not received two policies about investigation procedures, and Schindler's counsel responded he had produced everything he had received from Schindler. The court ordered the two remaining policies to be produced. Schindler asked the court to reconsider its order, and the court stated that its ruling ordering production of documents during trial was based on its finding that the documents had been properly and timely sought during discovery, that Schindler affirmatively represented that the documents did not exist, but a witness testified the documents did exist. The court also explained that ordering production of the documents was "an opportunity to remedy that discovery violation" without having to address whether sanctions were necessary to deter such conduct in the future.

After the jury's verdict was announced, Plaintiff's counsel told the court it still had not received the investigative documents, and its motion for sanctions was pending. The court told counsel "let's see if we can get the final document issue resolved[,]" and "depending on what the documents show, we can certainly cross that bridge whenever we get there."

The trial court based its orders to produce documents during trial based on the following findings: the documents were relevant and germane to the issues being tried; they were timely sought during the discovery window; Schindler represented that the documents did not exist, but witness testimony revealed that the documents were readily available; it was foreseeable that such documents would be discoverable because they dealt with the safety and maintenance of an elevator; the documents were standardized corporate policy manuals; and production of the documents did not constitute unfair surprise. The trial court told the parties it could reopen discovery at any time, which is consistent with Texas Rule of Civil Procedure 190.5, which permits a court to modify a discovery control plan "at any time" when justice requires. *See* Tex. R. Civ. P. 190.5. We do not agree with Appellant that the trial court violated Rule 190.3, and the record reflects that the order to produce documents during trial related to documents were timely requested, that existed, and that Schindler failed to produce during the discovery period, and the order was "an opportunity to remedy that discovery violation[.]" Because the trial court's

discovery orders find support in the facts and circumstances of the case and they were not arbitrary or unreasonable, we conclude that the trial court did not abuse its discretion. *See Samlowski*, 332 S.W.3d at 410; *Pape*, 48 S.W.3d at 912. We overrule Appellant's third issue.

Motion for Sanctions

In its fourth issue, Appellant argues that the trial court erred by imposing sanctions on Schindler for alleged pretrial discovery abuse. According to Appellant, Ceasar waived his right to seek sanctions because he failed to move to compel before trial. Appellant argues that, in his deposition, Hoover testified that Schindler possessed a policies and procedures manual, and because Ceasar became aware of the manual based on Hoover's deposition, he was barred from seeking a posttrial sanction based on pretrial conduct of which he was aware, citing to *Meyer v. Cathey*, 167 S.W.3d 327, 333 (Tex. 2005) and *Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993). Appellant further argues that, even if Ceasar did not waive his right to seek sanctions, the sanctions were "manifestly unjust" because Schindler, through its counsel, appropriately responded to the RFPs at issue. Appellant also argues that it reasonably construed Plaintiff's RFPs relating to "the facility" to seek documents specific to the hotel, and it truthfully denied it had responsive documents. In addition, Appellant argues that no evidence supported the

61

trial court's finding that Schindler "failed to inform its own attorney of the existence of the documents" Plaintiff requested.

Appellant argues that the sanctions imposed violate the Supreme Court's criteria set in *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) because (1) there was no evidence that Schindler was involved in the relevant pretrial discovery events, (2) the documents at issue caused no prejudice because they were produced during trial, and (3) the sanctions were excessive because "Schindler did nothing wrong[]" so that the proper sanction would be "zero dollars."

We review a trial court's imposition of sanctions under an abuse of discretion standard. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (citing *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004)). The ruling will be reversed only if the trial court acted without reference to any guiding rules and principles and the ruling was arbitrary or unreasonable. *Id.* To determine if sanctions are appropriate, the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed. *See Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). We must also ensure the sanction imposed is not excessive and that less severe sanctions would not have been sufficient to promote compliance. *TransAmerican*, 811 S.W.2d at 917; *see also 21st Mortg. Corp. v. Hines*, No. 09-15-00354-CV, 2016 Tex. App. LEXIS 13003, at *6 (Tex. App.—Beaumont Dec. 8, 2016, pet. denied) (mem. op.). The test for abuse of discretion is not whether the

reviewing court thinks that the facts presented an appropriate case for the trial court's action, but whether the trial court acted without reference to any guiding rules and principles. *See City of Dallas v. Cox*, 793 S.W.2d 701, 724 (Tex. App.—Dallas 1990, no writ) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

Ceasar filed a motion for sanctions against Schindler and its counsel of record "for intentionally violating the Court's orders as to Plaintiff's motions in limine (multiple times), for failing to comply with the Court's evidentiary rulings during trial (multiple times), and for failing to produce relevant and discoverable documents." According to the motion, Schindler represented to Ceasar that certain policy and procedure manuals did not exist when they did exist, and Schindler failed to produce all but one of the manuals.

At a post-trial hearing on the motion for sanctions, the court addressed "the late tendering of items and discovery in the middle of trial[]" and explained that "when there is relevant evidence that is not disclosed or is obscured or even hidden at times, it does somewhat create the appearance of unfairness[.]" The court further stated it should have been "very obvious and apparent" that a policy manual for servicing elevators should have been disclosed "from the get-go[.]" Schindler told the court that, based on the wording in Plaintiff's RFPs, it was appropriate to object to the RFPs as overly broad or for asking for materials that would be in the

possession of Otis (the elevator manufacturer) or the Elegante. Schindler also stated that a party must seek a motion to compel or ruling on objections, else the right to seek sanctions is waived. Schindler also stated that its counsel had provided all documents before the end of trial. Plaintiff's counsel told the court that it had requested the documents almost a year before trial and Plaintiff relied on Schindler's response that it had no responsive documents. The court stated that Plaintiff had objected to the lack of production, and its objection was sustained. The court also told counsel for Schindler that it appeared that counsel had worked diligently to procure the items during trial.[3]

---

[3] The trial court also issued a "letter ruling" stating the basis for the sanctions order. Generally, when a trial court sends a letter to the parties accompanying its order, the written order itself, and not the letter, is controlling on appeal. *See, e.g.*, *Trahan v. Fire Ins. Exch.*, 179 S.W.3d 669, 672 n.2 (Tex. App.—Beaumont 2005, no pet.); *see also Mattox v. Cty. Comm'rs Court*, 389 S.W.3d 464, 469 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

In the letter ruling, the trial court stated in relevant part:

[T]he Court finds that the Schindler policy manual and the work orders for the 12 month period preceding the accident were responsive to the original discovery request and should have either been produced, or at a minimum, disclosed the existence of the materials subject to an applicable objection. Likewise, following the email of June 20, 2018 from the Plaintiff requesting specific discovery, the Defendant should have supplemented their discovery with the documents at issue or disclosed their existence, subject to an objection. Furthermore, the Defendant even failed to inform its own attorney of the existence of these documents, which consequently resulted in the inaccurate discovery response that no responsive documents existed. The Court finds that these failures by Schindler were a material violation of Tex. R. Civ. P. 193.1, and therefore a monetary sanction of $25,000.00 is warranted.

The first matter we consider is the relationship between the conduct in question and the sanction imposed. There should be a direct nexus between the offensive conduct, the offender, and the sanction award. *See Low*, 221 S.W.3d at 614. In this case, the trial court distinguished the conduct of Schindler from that of its counsel. Therefore, we find this prong is satisfied. *See TransAmerican*, 811 S.W.2d at 917 ("[T]he sanction should be visited upon the offender. The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both.").

Next, we consider whether the punishment is proportional relative to the misconduct and whether the sanction is excessive. *Id.* Here, the trial court stated that Schindler had multiple opportunities to remedy the deficiencies, and a lesser sanction would not be appropriate in light of the facts and cost to defend the lawsuit. *See id.* ("courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance").

---

There are several specific reasons supporting this decision. First, the Defendant had an opportunity to remedy the deficiencies (1) in the general discovery responses, (2) in their supplemental responses, and (3) following the Court's admonishment at the pre-trial hearing. The Court further recognizes the need of the civil justice system to promote discovery standards that are efficient, reliable, expedient, fair, and complete. A lack of diligence by a party in procuring and producing relevant discovery wastes the Court's time and resources, undermines the confidence of the civil discovery process, and offends the traditional notions of good faith and fair dealing.

As to Appellant's argument that Plaintiff waived its right to seek sanctions because it did not file a motion to compel, we note that the trial court explained on the record at the sanctions hearing that the Plaintiff had timely objected to the lack of production, and the objection was sustained. As to Appellant's argument that Schindler itself was not involved in the discovery, the trial court found otherwise and concluded that Schindler had failed to advise its attorney that it had documents that were responsive to Plaintiff's RFP. We conclude that the trial court's order awarding sanctions is not unreasonable or arbitrary. We cannot say the court acted without reference to guiding rules and principles. We find that the trial court's sanction award was within the zone of reasonable disagreement. *See Am. Flood Research, Inc.*, 192 S.W.3d at 583; *Cox*, 793 S.W.2d at 724. We overrule Appellant's fourth issue.

Jury Instructions

In two issues, Appellant challenges the jury charge. Appellant argues the trial court erred by including an instruction on *res ipsa loquitur*, and by excluding the Defendant's requested instruction on spoliation of evidence. A trial court has wide discretion in submitting jury instructions and questions. *See Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review a trial court's decision to submit or refuse a particular jury instruction or question for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex.

2012); *Liberty Mut. Ins. Co. v. Camacho*, 228 S.W.3d 453, 459 (Tex. App.—Beaumont 2007, pet. denied) (citing *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990)). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). We will not reverse a judgment for charge error unless that error probably caused the rendition of an improper judgment or because it probably prevented the appellant from properly presenting its case to the appellate courts. *See Thota*, 366 S.W.3d at 687 (citing Tex. R. App. P. 44.1(a), 61.1).

## *Res Ipsa Loquitur*

A *res ipsa loquitur* instruction may be used in particular cases when "the circumstances surrounding the accident constitute sufficient evidence of the defendant's negligence to support such a finding." *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990) (citing *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 250 (Tex. 1974); *Marathon Oil Co. v. Sterner*, 632 S.W.2d 571, 573 (Tex. 1982)).

> *Res ipsa loquitur* is applicable only when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant.

*Id.* Where there are multiple defendants, any of whom could have been separately responsible for the accident or injury due to its own negligence, *res ipsa loquitur*

67

does not apply. *Sterner*, 632 S.W.2d at 574. "The possibility of other causes for the accident besides the defendant's negligence does not have to be eliminated, but the likelihood of other causes must be so reduced that the jury can reasonably find that the negligence, if any, was committed by the defendant." *Id.* (citing *Bell*, 517 S.W.2d at 251). "[T]he 'control' requirement is not a rigid rule that the instrumentality must have always been in the defendant's possession or even that it must have been in the defendant's control at the time of the injury." *Bell*, 517 S.W.2d at 251 (citing *Honea v. Coca Cola Bottling Co.*, 183 S.W.2d 968 (Tex. 1944)). "It is sufficient that the defendant be in control of the instrumentality at the time that the negligence inferable from the accident probably occurred." *Marathon Oil Co.*, 632 S.W.2d at 574.[4]

---

[4] When the doctrine applies, it allows the factfinder to infer negligence provided the character of the accident is such that it would not ordinarily occur in the absence of negligence and the evidence shows that the instrument causing the injury was under the management and control of the defendant. *Owen v. Brown*, 447 S.W.2d 883, 886 (Tex. 1969). We note that in *Gaulding v. Celotex Corp.*, the Texas Supreme Court stated that *res ipsa loquitur* is only applicable when two factors are present:

> (1) the character of the injury is such that it would not have occurred in the absence of negligence; and (2) the instrumentality which caused the injury is shown to have been under the *sole* management and control of the defendant. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex. 1986); *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 251 (Tex. 1974).

772 S.W.2d 66, 68 (Tex. 1989) (emphasis added). Nonetheless, neither *Porterfield* nor *Bell* used the qualifier "sole" as to the "management and control." *Porterfield*, 719 S.W.2d at 559; *Bell*, 517 S.W.2d at 251. The Texas PJC also does not include the requirement of "sole" management and control. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 51.8 (2018).

Appellant's fifth issue argues that the trial court erred in giving a *res ipsa loquitur* instruction. According to Appellant, "the evidence at trial showed that elevators inevitably malfunction on occasion even when properly maintained." Appellant also argues that in this case, there was direct evidence of the accident's cause,[5] and *res ipsa loquitur* was therefore inapplicable.

Appellant also argues that Schindler did not have exclusive control over the elevator; it did not manufacture the elevator, SDI board, or the elevator's controller; and the hotel and its personnel own and have control over the elevator. Appellant also argues that hotel guests use the elevator continually, and Prudhomme testified that guests sometimes misuse elevators and cause problems with their luggage or holding the door open. According to Appellant, the exclusive-control requirement is not met in this case because of the hotel's control over the elevator and use or misuse of elevators by hotel guests.

The instruction given in the Charge stated:

---

[5] Appellant states that there was direct evidence of Schindler's negligence. Appellant notes that Freeman testified that based on his review of Schindler's maintenance records and his own inspection of the elevator, Schindler did not properly maintain the elevator and this improper maintenance caused the elevator's SDI board to fail, which then caused the elevator to overspeed and stop abruptly. Schindler did not raise this argument during the charge conference or in its Trial Brief on the Exclusion of Jury Question on *Res Ipsa Loquitur*. Schindler also did not argue at trial or in the charge conference that it was error to submit an instruction on *res ipsa* because there was direct evidence of negligence. Therefore, Schindler failed to preserve this argument. *See* Tex. R. App. P. 33.1.

You are instructed that you may infer negligence by a party but are not compelled to do so, if you find that the character of the accident is such that it would ordinarily not happen in the absence of negligence and if you find that the instrumentality causing the accident was under the management and control of the party at the time of the negligence, if any, causing the accident probably occurred.

The jury charge also defined negligence, ordinary care, and proximate cause.

We need not decide whether the trial court erred in submitting the *res ipsa* instruction because we conclude that Appellant has failed to establish that the instruction given probably caused the rendition of an improper judgment. *See Trans Am. Holding, Inc. v. Market-Antiques and Home Furnishings, Inc.*, 39 S.W.3d 640, 649-50 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)).

In this case, the jury charge also included an instruction on circumstantial evidence:

The term "circumstantial evidence" means a fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Based on the evidence presented at trial, the jury could have decided that Schindler was negligent from either the direct or circumstantial evidence in the case. The jury could have believed the testimony provided by the Plaintiff's expert that Schindler's

inadequate or improper maintenance and repair to the control board caused the accident even without relying on the *res ipsa loquitur* instruction. Accordingly, Schindler has failed to demonstrate harm or that the instruction probably led to an improper judgment. *See* Tex. R. App. P. 44.1(a), 61.1; *Thota*, 366 S.W.3d at 687; *Island Recreational Dev. Corp.*, 710 S.W.2d at 555; *Trans Am. Holding, Inc.*, 39 S.W.3d at 650.

On appeal, Schindler argues that including the *res ipsa* instruction was harmful and probably caused an improper judgment. Schindler argues that the instruction was harmful and requires reversal because (1) the instruction was "incorrect law" that was inapplicable to the case and (2) it related to a "contested, critical issue[,]" citing to *Glenn v. Leal*, 596 S.W.3d 769, 772 (Tex. 2020) and *Railroad Commission of Texas v. Gulf Energy Exploration Corp.*, 482 S.W.3d 559, 571 (Tex. 2016). *Glenn* concerned "whether the jury should apply a standard of willful and wanton negligence[.]" *See* 596 S.W.3d at 772. As such, it pertained to the standard of proof required of the plaintiff when the complained-of conduct relates to emergency medical care. *Gulf Energy* concerned the failure to submit an instruction on a good-faith defense. *See* 482 S.W.3d at 571-72.

Schindler failed to make these arguments to the trial court. In *Glenn*, the plaintiff had requested an instruction on willful and wanton negligence, but the trial court denied the instruction and gave the jury an instruction on ordinary negligence.

71

*See* 596 S.W.3d at 771. In *Gulf Energy*, the Court concluded that error had not been waived because the defendant had submitted a proposed question in writing on its good-faith defense. *See* 482 S.W.3d at 571-72. In addition, the Court reversed and remanded on a second issue, namely the failure to submit a jury question on whether there was a binding contract between the parties. *Id.* at 572-76. We find these cases distinguishable because *Glenn* and *Gulf Energy* concerned whether certain critical legal issues were presented to the jury. An instruction on *res ipsa* does not concern a theory of recovery (or defense thereto) but is merely one means by which a jury may infer negligence. *See Trans Am. Holding, Inc.*, 39 S.W.3d at 650 (explaining that *res ipsa* is not an independent theory of recovery but a rule of evidence whereby negligence may be inferred); *Nichols v. Copeland*, No. 05-99-01233-CV, 2001 Tex. App. LEXIS 4761, at **6-7 (Tex. App.—Dallas 2001, pet. denied) (mem. op.).

Schindler also argues that "[t]he instruction on circumstantial evidence was sufficient in this case," and that giving a separate *res ipsa* instruction "exacerbated" the error, citing to *Lee v. Huntsville Livestock Servs.*, No. 14-02-00182-CV, 2003 Tex. App. LEXIS 2861, at *4 (Tex. App.—Houston [14th Dist.] Apr. 3, 2003, pet. denied). The record does not reflect that Schindler made this argument in the trial court. And in *Lee*, the court concluded that the appellant had not shown it was "entitled" to instructions on both *res ipsa* and circumstantial evidence—not that giving both instructions was harmful or that it "exacerbated" any error. *Id.* at *6. The

court in *Lee* also noted that "a circumstantial evidence instruction…has been recognized as properly informing the jury it could infer negligence from circumstantial evidence." *See id.* at **6-7 (citing *Trans Am. Holding, Inc.*, 39 S.W.3d at 650; *Nichols*, 2001 Tex. App. LEXIS 4761, at **6-7). Schindler also argues in its brief on appeal that "[d]irect evidence of Schindler's alleged negligence, including maintenance records, came in at trial." We agree that there was both direct and circumstantial evidence from which a jury could have concluded that Schindler's negligence was a cause of the occurrence in question. We cannot say that Schindler has established it was harmful to give a *res ipsa* instruction because the jury could have decided Schindler was negligent based on direct evidence alone and because it failed to object to the instruction on circumstantial evidence. *See also Mobil Chem. Co.*, 517 S.W.2d at 255 (submission of instructions on *res ipsa* and specific acts of negligence is not reversible error); *Trans Am. Holding, Inc.*, 39 S.W.3d at 649-50 (concluding that even if appellants had shown that the character of the incident was such that it could not have occurred without negligence, they did not show that the error resulted in an improper judgment where there was direct evidence of negligence). We overrule Appellant's fifth issue.

Spoliation Instruction

In its sixth issue, Appellant argues that the trial court erred by refusing to include an instruction on spoliation of evidence because Ceasar "deliberately destroyed" his Facebook Live video that he made when the incident occurred. According to Appellant, it was significantly prejudiced by Ceasar's destruction of the video, which Appellant characterizes as "uniquely probative evidence." Appellant argues that the video likely showed that Ceasar was not injured by the abrupt elevator stop and would have undermined his credibility. Although Pearson, the acting hotel manager at the time of the incident, testified that she watched the video, Appellant argues that her testimony is "no substitute for the video itself."

We review the denial of a spoliation instruction for an abuse of discretion and reverse only if the trial court's denial of the instruction was arbitrary or unreasonable. *See Mangham v. YMCA of Austin, Tex.-Hays Comtys.*, 408 S.W.3d 923, 931 (Tex. App.—Austin 2013, no pet.). A party seeking a remedy for its opponent's spoliation of evidence must satisfy three elements: "(1) the party who destroyed or failed to produce evidence had a duty to preserve it; (2) the party either negligently or intentionally breached that duty by destroying the evidence or rendering it unavailable; and (3) the breach prejudiced the nonspoliating party." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 19 (Tex. 2014) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 955-58 (Tex. 1998) (Baker, J., concurring). The duty to

74

preserve evidence arises "when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in [his] possession or control will be material and relevant to that claim." *Wal-Mart Stores, Inc v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003).

Appellant argues that Ceasar intentionally spoliated evidence when he deleted his Facebook Live video "after speaking with his lawyer, filing an incident report with the hotel, and going to the emergency department for treatment." Appellant further argues that "[r]ight after the elevator incident, Ceasar started behaving like a person planning to file a personal injury lawsuit." According to Appellant, the court's refusal to give a spoliation instruction meant there was no remedy for Ceasar's spoliation, and because the case was closely contested, the likelihood of harm was substantial, citing to *Aldridge*, 438 S.W.3d at 29. In that case, the Supreme Court concluded that a spoliation instruction was given in error, and because the case was closely contested, the likelihood of harm was substantial. *Id.* (citing *Johnson*, 106 S.W.3d at 724).

Appellee argues that there is no proof that Ceasar knew he had a duty to preserve the video and intentionally destroyed it at a time when he knew or should have known that he was going to file a claim. Schindler argues that Ceasar deleted the video "after speaking with his lawyer[.]" The record reflects that Ceasar did speak with his brother-in-law, who is an attorney, and that his brother-in-law served

75

as Ceasar's attorney in previous lawsuits. But the record is silent as to whether the conversation with his brother-in-law prompted Ceasar to delete the video. Ceasar testified that he decided to delete the video because it brought back bad memories and made him feel like he was reliving the event, and he specifically denied that he thought about suing before he deleted the Facebook Live video. Ceasar testified that he went to the hospital in Port Arthur because he was feeling pain, and the hospital records indicate Ceasar had acute pain that he rated 8 or 10 out of 10, and Ceasar was prescribed pain medication. Ceasar testified that he made a written report at the Elegante in response to the hotel's request that he do so. Pearson, the acting manager at the Elegante on the day of the incident, also testified that the hotel's procedure is to obtain a statement from a person who is injured at the hotel, which is sent to the general manager and the corporate office. Ceasar testified that he wished he had saved the Facebook Live video. Pearson testified that she watched the video, and that it showed Ceasar was kicking and beating the elevator door and seemed "very agitated[.]" She did not recall Ceasar ever saying in the video that he was injured or appeared injured.

As for Schindler's argument that the video would have shown that Ceasar was not injured, Drs. Brennan, Hayes, and Cowen testified that they treated or observed Ceasar, and each testified about Ceasar's injuries. The doctors' medical reports were

also admitted into evidence in addition to Ceasar's patient records from his treatment at the Port Arthur hospital on the day of the incident.

In denying Schindler's request for a spoliation instruction, the trial court stated:

> [T]he Court does not find that there's a sufficient showing by either side to demonstrate that the presentation of a cause of action or any defense in the case has been materially obstructed or prevented by certain evidence not being preserved or deleted.…I'll note that the Court considered that there was other evidence of what was contained within that video from the witnesses who had actually observed the video.…[T]he law is pretty clear from the showing of what must be established in order for a spoliation instruction to be included in the charge is an extremely high showing and one that would relate to either a party being materially prejudiced or disadvantaged in the presentation of the case by destruction of the evidence or it being done maliciously or intentionally in order to hinder the opposing party's presentation of the case. I don't find that either has been established[.]

Applying an abuse of discretion standard of review, we cannot say the trial court abused its discretion in denying the spoliation instruction. Additionally, Schindler has failed to meet its burden to establish that Schindler was prejudiced by the deletion of the video. *See Aldridge*, 438 S.W.3d at 14. We overrule Appellant's sixth issue.

## Motion for Mistrial

In its seventh and final issue, Appellant argues that the trial court erred by denying its motion for mistrial. The motion for mistrial cited five errors that Appellant claimed warranted a mistrial: (1) the court's exclusion of evidence that

Ceasar applied for and was denied SSD benefits, (2) the court's exclusion of evidence of Ceasar's previous lawsuits, (3) the court's rulings that required Schindler to produce documents during trial, (4) the court's refusal to allow Schindler to offer evidence or question witnesses about the Elegante's responsibility for the elevator incident, and (5) the improper admission of hearsay testimony from plaintiff's expert that Schindler had a poor reputation in Texas. Schindler's motion for mistrial asked the court to declare a mistrial, grant a new trial, and continue the new trial pending the appeal of the summary judgment ruling in favor of the Elegante.

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *See Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009); *Michaelski v. Wright*, 444 S.W.3d 83, 89 (Tex. App.—Houston [1st Dist.] 2014, no pet.). A mistrial is required only in extreme circumstances, where the prejudice is incurable. *See Givens v. Anderson Columbia Co., Inc.*, 608 S.W.3d 65, 71 (Tex. App.—San Antonio 2020, pet. denied). Under the doctrine of cumulative error, the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would. *See Sproles Motor Freight Lines, Inc. v. Long*, 168 S.W.2d 642, 644-45 (Tex. 1943); *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd,* 972 S.W.2d 35 (Tex. 1998). To show cumulative error, an appellant

must show that, based on the entire record, but for the alleged errors, the jury would have rendered a verdict favorable to it. *See Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 810 (Tex. App.—Dallas 1987, no writ). If there are no errors, we do not address whether there is cumulative error. *See In re E.R.C.*, 496 S.W.3d 270, 281 (Tex. App.—Texarkana 2016, pet. denied). We have already addressed the first three items and found no error. We next address Appellant's fourth and fifth alleged errors.

The Elegante's Alleged Responsibility

Prior to trial, the trial court granted the Elegante's Traditional and No-Evidence Motion for Summary Judgment and entered a final summary judgment and order of severance on behalf of the Elegante that stated in part "[t]his order is intended to fully and finally dispose of all claims and causes of action Plaintiff Darren Ceasar asserts against Defendant 904 Hotel Operating, LLC [d/b/a MCM Elegante Hotel] in this matter." When Schindler moved for a mistrial during the trial, the trial court stated that when the Elegante moved for summary judgment, Schindler did not file a response, a countering position, a cross-claim, or a Motion to Designate Responsible Third Party. The court further explained:

> [It] would be impermissible argument or impermissible statement…to try and allege that the Elegante[] was negligent in some way, shape, or form in the maintenance or any activity that they may have done in relation to these particular elevators. And the basis for that ruling, again, was foreclosed upon the fact that since the Elegante[] was released from this litigation given that the Court's prior Summary Judgment ruling on there was no evidence of liability, that matter of

79

trying to place or infer any negligence or liability on the part of the Elegante[] would have been improper.

Section 33.003(a) of the Civil Practice and Remedies Code requires a jury to determine the percentage of responsibility by each claimant, defendant, settling person, and responsible third party. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). Subsection (b) "does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission." *See id.* § 33.003(b). The Code defines "defendant" as "any person from whom, at the time of the submission of the case to the trier of fact, a claimant seeks recovery of damages." *Id.* § 33.011(2).

Schindler argues that the Elegante was a "defendant" at the time the case was submitted to the jury because Plaintiff was challenging the summary judgment that was severed from the claims against Schindler and in fact later appealed it. We disagree. The order of February 5, 2018 granting summary judgment in favor of the Elegante reflected that there was insufficient evidence of any negligence by the Elegante. The order also severed the claims against the Elegante from the claims remaining against Schindler and assigned it a new cause number. Therefore, at the time of trial in March 2019, Schindler was the only defendant in the case presented to the jury. Schindler also conceded this point in its Motion for Reconsideration of the Denial of Its Motion for Mistrial and Motion for Continuance. Additionally, the record before us indicates that Schindler did not file a motion designating the

80

Elegante as a "responsible third party."[6] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003, 33.004. And there was no evidence presented to the trial court that the Elegante was a "settling party."[7] Therefore, based on the record, we cannot say the trial court erred in refusing to allow Schindler to submit the Elegante as part of the negligence question, nor can we say the trial court erred in refusing to allow Schindler to argue or offer evidence of the Elegante's responsibility.

Reputation Evidence

Appellant argues that the trial court erred by overruling its objection to the testimony of Freeman that Schindler had a "very poor" reputation in Texas. The following exchange occurred on direct examination of Freeman by plaintiff's counsel:

Q. [W]hat's Schindler's general reputation in the elevator industry, especially here in Texas?

---

[6] A "responsible third party" is defined by statute as
[] any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.
Tex. Civ. Prac. & Rem. Code Ann. § 33.011(6). And a party must designate a responsible third party "on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date." *Id.* § 33.004(a).

[7] A "settling party" is defined by statute as "a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought." Tex. Civ. Prac. & Rem. Code Ann. § 33.011(5).

A. They have a very poor reputation here in the State of Texas.

Schindler did not object to this testimony. Schindler's counsel later cross-examined

Freeman as follows:

[Counsel for Schindler]: …You said that Schindler has evidence of a bad reputation; is that right?

A. That's correct, sir.

[Counsel for Schindler]: Tell me -- what evidence of that? Who said that? Where did you see that? Why do you think that?

A. I can see that in the techs that I have visited with and the other customers that I have seen and when I've done the property assessments or inspections.

Schindler's counsel then asked Freeman for names, and Freeman gave two names.

During redirect, Plaintiff's counsel again asked about Schindler's reputation,

Schindler objected, and the following exchange occurred:

[Counsel for Schindler]: I'm going to object. Anything he says about what somebody said is hearsay. If he says[,] "Larry said this," that's hearsay and I object.

The Court: Hold on. You may have opened the door to that, though when you did ask your prior question.

[Counsel for Schindler]: The question is did he know. If he says, "Larry told me," that's different. If he's seen it, I have no problem with that.

The Court: I mean, without getting into the content of the actual quote verbatim what was said, if there are people that had communicated dissatisfaction with the work or service, that would not be hearsay. You can answer that.

82

On appeal, Schindler argues that evidence of a party's reputation is inadmissible hearsay. Schindler did not make this objection at trial. Schindler also failed to object the first time Freeman commented about Schindler's reputation. Therefore, the point of error was waived, and any error is harmless. *See* Tex. R. App. P. 33.1; *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (concluding that error in the admission of evidence was harmless where other evidence of the same information was admitted without objection); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984); *see also* Tex. R. Evid. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."). Therefore, we overrule this issue.

We further conclude that Schindler failed to meet its burden to establish that the trial court abused its discretion in denying the motion for a mistrial and Schindler has failed to show that any prejudice caused by the alleged errors was incurable. *See Givens*, 608 S.W.3d at 71. We overrule Appellant's seventh issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 16, 2021
Opinion Delivered November 30, 2021

Before Golemon, C.J., Horton and Johnson, JJ.

83